Our next case is 25-2653 In Re Ocugen. Good morning, Your Honors. Jeremy Lieberman from Pomerantz LLP on behalf of Appellants. Your Honor, we respectfully submit that the District Court committed five minutes rebuttal time, please. Sorry. Your Honor, we respectfully submit that the District for finding of lack of materiality. With respect, the Court did so, Your Honor, by analyzing two corrective disclosures and the method that it did so, and the way that it did so, we believe was legally and factually incorrect. With respect to the August 15, 2023 corrective disclosure, the Court found that the fact that the stock recovered within six days was not enough to, found materiality, of which we obviously do not disagree, but the Court held because there was no misstatements in that August 2023 corrective disclosure, it was not actionable. Your Honor, that reasoning is simply faulty. We were not alleging only that the August 15, 2023 corrective disclosure made a misleading statement as well. There were a lot of misstatements before that. This corrects those misstatements. Absolutely, Your Honor. Even if you say there's no misstatement in that particular disclosure, you still have to go back and analyze the other statements and determine whether or not those are material misstatements. 100%. And what the District Court did was, the District Court simply failed to do it, myopically looked only at the August 20, 2023 disclosure, and failed to consider whether or not that disclosure corrected previous misstatements. Let me ask you some questions. So, as I read your complaint, you have four sets of false statements from Q1, 2020 through Q3, 2023. And I want to tell you sort of how I've characterized those. And my question at the end is, am I missing any categories? So, the first is the quarterly and yearly financial statements. The second is the quarterly and yearly financial statements about the effectiveness of the internal controls. The third would be the quarterly and yearly SOC certifications. And the fourth would be the yearly statements about the CanSino Bio Agreements. Am I missing any category? You're not, Your Honor. No. Okay. All right. And I want to understand for the 2020 and 2021 time frame, what are the allegations of materiality? Your Honor, the company did admit that there were material misstatements with respect to internal controls. And also, every inference is that as long as the CanSino Bio Agreement was in place, the method for accounting for this agreement was false and misleading. We have the CW-3 attesting to the fact that there couldn't be any access by any employee to that agreement, to the details of the agreement, the costs and expenses, the implementation of that agreement. And there's no indication from that CW testimony that that changed at any time. He said that was from the outset of the agreement. So, as long as there was CanSino Bio Agreement in place, you have an inability of anyone to go ahead and to check and to verify those numbers. That itself is de facto an internal control failure. Okay. That leads me to two more questions. The first one is, particularly for CW-1, there's some specific statements that are undated. Is there anything we can look at for undated statements to determine what timing we're talking about? Particularly because when we're talking about a period this long, we could be in Q2, Q3. I don't know if we're talking about earnings calls. I don't know if I'm talking about a 10K. I don't know if I'm talking about a Q. What do I look to for the undated statement? It's a very fair question, Your Honor. I think the best inference is the dates of employment. So that if they were employed during a certain time period, there's nothing on the record that would indicate that anything changed from the time they were employed. They're giving a characterization. Well, let me push back on that a little bit. Because for CW-1, CW-1 says, well, it was my job to communicate with R&D, and I used my communications with R&D to create, I think they called it forecast, financial forecast. I'd create the financial forecast, and if the CEO didn't like it, they'd just change it. But then he says, but then they blocked my access to R&D. Everything, all my R&D appointments went off the calendars, and my access was blocked. And that seems to be in like late 2020, early 2023. So I'm looking at this thinking to myself, okay, what does that mean for Q1 2022? What does that mean for Q2 2022? What does that mean for Q3 2022? Am I talking about, does that mean that there were no issues until that point? When do those statements, what does that apply to? I mean, he certainly has, there's testimony from CW-1 regarding the forecasting and the 2022-2023. They failed to account for the fact that the enrollment was actually much lower than they had forecast, and therefore that was going to push off a lot of the expected revenues and earnings. So you do have characterizations on the dates there. To the extent that, there is a question, Your Honor, and I think it's a fair question. There are certain points where there are gaps. I think the way you fill those gaps is this testimony that does get to provide exact dates where we have 2022-2023. You have the testimony by CW-3 who says, from the beginning of Cancino Bio, you never were able to access the books and records, and you have the overall testimony showing this is just, and you have the restatement which says that there is an internal control problem, really going back to all periods. They only restate the prior two years because that's all you're required to do under GAAP, but that doesn't mean that there was not an internal control deficiency. Let me ask you another question about that time. So there's the $4.3 million deficit during that time, $4.6 million deficit during that 2021 time frame. What's the right denominator for that? Is it the $130 million? It may be, Your Honor. Kindly, I'm not prepared on that point. I can tell you that, so with respect to that, you definitely have the internal control failures, and there's no indication that those internal control deficiencies occurred at any later point. Clearly, you have an admission by the company that there was misstatements that occurred in those earlier periods. There's a need to adjust the figures, so those internal control failures occur, really, from the outset of the class period. As far as the materiality of the numbers, I think there is a fair point that under the allegations of complaints, that materiality is not established on the numbers until 2022, 2023. So if that's where Your Honor is going, I think that is a fair point. The internal control failures start from the beginning of the class period. It's clear that that issue from CanSinoBio happened from the outset. It's clear that all CWs attest to the same misconduct occurring through the period. There's nothing to indicate that anything changed from day one to the end of the class period. So that's, Your Honor, how we would look at those allegations. And I apologize, I have a lot of questions. Please, please go ahead. So, your complaint paragraphs 53 to 82, and those are all about, I think, the effectiveness of the internal controls. I just want to make sure that that's what those paragraphs focus on, and they're not alleging some other false statements. I just want to turn to the right. The characterization regarding the, it's a lot of what you get to see, regarding all the forecasting, all the manipulations regarding the forecasting. I think that's fair, Your Honor, to some degree. Although there was a, there are allegations by CW1 with respect to CanSinoBio itself, it talks about how the forecasting was done poorly. Then there's a statement on CanSinoBio. So to that effect, I would say that does reflect also upon the restated figures there as well. We don't, there is a gap to know exactly how the manipulation on the forecasting devolved into how actually the liabilities were misstated, but clearly there's an interrelatedness. And so to that extent, we wouldn't agree that there's no relationship between those, you know, the restated numbers and the fraud alleged with respect to the CanSinoBio forecasting. And then focusing on paragraphs 215 to 218, would you agree that the restatement concerns is really focused on the CanSinoBio agreement? Like it's not concerning anything else. I understand the stocks and I understand the, but I just want to make sure there's no allegations about anything other than CanSinoBio focused. The restatement clearly only impacts as far as we understand the CanSinoBio agreement, and that was what triggered the false misstatements. Now, if I may, Your Honor, turning to the April 1, before we turn there, I'm struggling a little bit with how the August 2023 statements can be on your theory, both misstatements and corrective disclosures at the same time. And I got them in front of me and I'd like you to just parse out the corrective disclosure theory, like what language you're focused on, what's being corrected. Sure. What is being corrected? The market is learning for the first time at the statement that the CFO Vu is leaving the company. We know, we understand now from the CWs what the reasons were for that termination. And when a CFO leaves- What part of the statement is that correcting? The internal controls, Your Honor. We've submitted clearly the internal controls because we know the reason for his resignation. He resigned according to CW1 through CW3 because he felt that the statements were false and misleading. And so because of that, you have a scenario where, and I think it also partially correct for falsity of the metrics as well, but certainly we would say on the internal controls, you have a scenario where the CFO just won't sign onto the papers. And at the same time they announced his resignation, they announced we're not gonna be able to file our Qs on time. And what we know from what was going on behind the scenes was Vu won't sign the papers, he resigns. They go to Andrews, he's not gonna sign the financials. He ultimately- Those sound to me like material omissions. As far as, so is the question now on why it's corrective or on falsity? I'm not seeing it as corrective. I'm struggling there. Your Honor, we had certainly, and there's certainly under descendant authorities that if it touches upon misstatements, you don't need to show, particularly when it's a partial corrective disclosure. We know at the end of the day, there was a massive restatement, but with respect to the August, 2023 disclosure, we would say, Your Honor, the market perceives that there is internal strife with respect to the CFO and it does connect to the published financial statements. And it does then tell the market something about internal controls, which actually corrected itself, which actually turned out to be true down the road. Usually, truth, Your Honor, doesn't come out in a full statement of admission by a company. Usually it's drips and drabs, there's a scandal, there's a resignations, information that there's a late filing, and then I'll get it. Those sound to me like omissions cases. There might be an omission when you say you have proper internal controls, that's a false statement because the internal controls here, Your Honor, were clearly not effective. And when the CFO resigns because he won't sign on to the financials because he thinks they're fraudulent, that is a classic case of poor internal controls. So we think it's clearly, it's partially correcting a false statement. Of course, it's not a full corrective disclosure because the market didn't fully learn what happens. It had to learn that down the road with respect to restatements. And even then, they weren't fully told that, hey, CFO wouldn't sign the papers because he thought it was false and misleading. They asked multiple personnel to sign on to these financials because they thought that they were false and misleading. So we do believe it's a partial corrective disclosure. We think the sentencing case talks about how it's not an issue of a full disclosure, it's an issue of proximate cause. On page 38 to 39 of your, I think it's your opening brief, you say that you're not challenging some portion of the district court's decision regarding the August disclosure. What specifically is that? We're not, we also disclosed as Jehoboam referenced, we had previously said that the disclosure itself was partially false and misleading because they didn't disclose the reasons for Vu's resignation. And your position, you've walked away from that. Primarily we want to focus on the corrective nature and we want to focus the court's attention on that, which we think the third circuit authority clearly makes, allows for a partial corrective disclosure in that instance. We'll turn into the, if I may, I'm behind my time or should I? I took most of it. Fair enough. I'll turn them to the April 1st, 2024 corrective disclosure. And there, the district court held that because the stock started to increase after a few days and May had made up for its losses. There wasn't a, there wasn't a case for, there wasn't proper pleadings for materiality. And we think that, that consistent with what we suggested or in Burlington cases? I think what the court has suggested, but the issue is, is in Burlington cases and, and, and, and most of its jurisprudence thereafter was that, was that when there was no market reaction whatsoever to the disclosure of information, then you potentially had a materiality issue. There's two distinctions here. First of all, there was on April 1st or April 2nd, there was a 10% decline in stock. It does go up a few days later. What's not in the record is how that performed compared to the market. In fact, it actually, it underperformed the market broadly. That's not on the record. And that's, these are questions of fact that the court should look at. And what's also happens is that within a month, the stock goes back, back to down to where it came from. And that often happens when there's a lot of information coming in the stock and there's good news and bad news. It happens to be on April 5th of that very week. They announced positive. What's the appropriate horizon we should look at? I think that I, well, the, the Waco's court actually looks at if there's a sustained recovery, i.e. does it ever go back down? And importantly, with respect to the August disclosure, the district court actually found that because the stock took six days to go back up and it ultimately goes back down several weeks later, he didn't find that there was lack of materiality. Here, we have the same scenario. By May 1st, the stock's right back down again. So I think it's clearly, if you'd have a scenario where, where first of all, there's no stock price decline whatsoever, I think that's something that's a different set of facts. And then also, if you had a situation where the stock simply, you know, remains elevated for, for a significant period of time after disclosure, then that would also be more under the Burlington line of cases. Burlington never considered a scenario, and this would be the first for this court to consider, the company is admitted to materiality. You've got an admission by the, by, by the company. There's a material misstatement of financials, and there's a material misstatement regarding internal controls. So a company says, we've made material misstatements, and yet we have a court saying, no, it's not material. I think that's a very, that's a very strong statement to make, particularly with a record here where there are stock price declines, where there's a further subsequent decline. I think it's far, at this stage of the pleading, it's far too premature to make that determination. I'll reserve the rest of my time, if I may. Good morning, Your Honor. Jay Dubow, from Trautman Pepper Lock, on behalf of defendants. Not surprisingly, we believe that Judge Hodge got it correct, and her opinion was right. Counsel, can I start with Oran Burlington? Yes. Is that case consistent with Basic versus Levington? I'm sorry, I couldn't hear. Is that case consistent with Basic? It's consistent with Basic, yes. Can you tell me why? Because Basic talks about what reasonable investors, what would be important for reasonable investors, as does the TSCV case. And Oran Burlington actually looks at what real investors did. Well, as I understand Basic, in defining materiality, it says, we look at the, whether or not the information would change the total, whether or not it would change the total mix of information available. Correct. Would you describe the Oran Burlington rule as a, well, standard, that's what you called it, as a rule, as a categorical rule? I'm sorry, I'm trying. Would you describe the Oran Burlington standard as a categorical rule? If the stock price doesn't move, there is no materiality. I think that's how the courts have, this circuit has interpreted it, yes. The Supreme Court has a case called Matrix. It was decided unanimously. And that says that a categorical rule would artificially, we're talking specifically about materiality. In that context, there was a bright line rule in the Matrix case, there was a bright line rule about what is material. And the Supreme Court unanimously said a categorical rule that artificially excludes information that would otherwise be considered significant to the trading decisions of a reasonable investor. It rejected that. How does that leave room for yet another categorical rule? Well, this, again, this circuit has treated what the Oran Burlington is different from other circuits. This has the, I think, viewed as the most efficient market viewed circuit, and in an efficient market, which is what we have here, that's what they've pled, it's the real test is what did investors who have their put their money at stake, what happened? Let me ask you this thing. If you have a company that produces drugs, and the company has been disposing that, you know, they're based, you know, they're going to be approved, they've been, you know, had discussions with the FDA, and they're going to be approved for stage two trials. And on the same day, in the same disclosure, they disclose that they've been lying about the FDA discussions about drug one, my example, but also they've gotten approval for drug number two, and the stock price doesn't move. It's your position, I just want to make sure that under our case law, the disclosure regarding the lies about drug one just categorically are not material because the stock price didn't move. In that case, there's additional disclosure, which I think would have to be factored in. That's not our facts. Correct. I think this that's not our facts. That's not the allegations here. Okay, even if Oran Burlington, even if we follow Oran Burlington, can you what is your best case to suggest that Judge Hodge got it right here? That is, do you have a case where we as a circuit have actually ignored a stock price drop immediately after a disclosure? I'm not aware. I'm not aware of one. Okay. There are some cases outside of this. The Third Circuit hasn't ruled that way, but we did cite in our brief, a couple of cases where there were drop, short drop, and then within a few days, the recovery, and those cases were found not a lack of materiality as well. What would be the correct cutoff date that we look to to see if the stock rebounds? Well, I mean, Merck is five days. I think the case is it's four or five days has been the test. And in Merck even, it was a four or five days, and then it dropped afterwards. And that was still, that still held because those later days were not to be considered in the same way that counsel has argued a month later that it dropped. That's really not relevant for these purposes. You look at the four to five days right after the announcement for the time for the market to absorb. And as we noted here, and as Judge Hodge noted, the price went with not only came back, but it actually even exceeded where it had been. Can we go back to the, the multiple disclosure hypothetical of one positive, one negative? How would you suggest that we navigate for Anne Burlington in that scenario? That's a good question, Your Honor. I think, again, we, I'd say we don't, we don't have those facts here. I think if those were the facts, we'd have to look at other, perhaps other elements. I don't know if it would be clear, you know, the question is, is it, I know materiality is something that often is for a trier of fact to decide unless it's so clearly not material. In a case like this, Judge Hodge said it was so clearly not material and we agree. In the case where you posit, where there's some other facts, it may not be, it may not be so clearly not material. Is there language in the two cases that we're talking about that, that gives a court that kind of room to navigate? I think I, I agreed with you earlier when you said that they look like, they read like categorical rules. Yeah, I don't know if it's, I think, again, I think it'd have to, I don't have that case in front of us, but I think we'd have to look at it. I don't, I'm sorry to make your, I don't mean to make your job harder here, but I think we're struggling a little bit with the viability of a categorical rule like that. The hypothetical illustrates one of the problems and I'm just sort of, I'm trying to draw on your expertise to think about what you would ask a district court to do in that scenario. Yeah, again, if I were in that scenario, I'd have to look and see what the other factor, all the other facts, which is a more traditional materiality test, like many of the other circuits have. It may be. Yeah. Yeah. Okay. But again, that's not our facts here. Can you talk to us about the judicial notice, things that you're asking us to do? Sure. And what went on with that in the district court and what you'd like us to do here? So, so we asked the, what was it issues? We asked the, the, the lower court to take judicial notice of an earnings call transcript that took place right after the class period in which following the announcement of the restatement. And then as well as the April 2nd transcript. Yes. And isn't that the one where Mr. Mucinari also disclosed good news about the FDA trials? I think they did. That's correct. And there was a day after the not great disclosure. I think that, I think that's correct, your honor. Okay. So maybe we do have something closer to what I was just describing. That wasn't raised by, that hasn't been raised in this, by plaintiffs in this case, but in the court below or in any briefing here, that may implicate the, I don't know why strategically it was done or not because they've, they've objected vociferously to, to taking judicial notice of that transcript, as well as the three analyst reports who covered the company and we asked to take judicial notice and, and judge Hodge did not address that. She said, well, I don't need to address that for, and take judicial notice for purposes of deciding in making her decision. So it's, it's, was not decided either way. You don't want us to take judicial notice? Oh, I do hear, on your DeNovo, on your DeNovo, just the part you like, I'm sorry, just the part of the transcript that you like. Well, the transcript, the transcript, as well as the analyst reports that, that they didn't, the, you know, the restatement is what was made. They didn't mention it. They didn't ask about it. They didn't mention it. This is what has a, was alleged as the false, the false and misleading information. And it was not even addressed or, or stated in any way by any of the analysts they didn't ask about. So we're not, when we asked to take judicial notice, it's not for the truth of what was said, but for the fact that it wasn't even said. But I, that, that hearsay logic works the same way. First, the fact of something was said, you don't have to believe that the positive announcement was true or that the substance behind it was accurate. It, we would just be looking at it for the fact that it was said and its impact on the market price, wouldn't we? Right. But here again, it wasn't, it wasn't here. We're again, it's, it's wasn't set. It wasn't addressed at all. I'm happy to keep up if you're honest, have other questions about that. I'd like to just address a couple points since I, since I do have some, some time. The, you, you count, you, you were asking council questions about the August 15th, 2023 statement. They, and I think as your honor noted, they conceded in their opening brief that they weren't, they with judge Hodge, there wasn't a false statement, but now they're, what they're claiming is that it's a corrective disclosure. And what that statement said, all it said was that the CFO was no longer at the company. And for somehow they claim that's corrective of all the, all the statements that were made by various confidential witnesses relating and relating to internal controls. What's very important is that this isn't when the company made the disclosures about the restatement in, in nine months later that they, that those statements and the internal controls were limited to just the internal controls in connection with the collaborative arrangement accounting, not some more general statement of problems with internal controls. And, and all the statements that they would like to say were false and misleading before the August 15th, 2023, that they've alleged all relate to that same collaborative arrangement accounting, because that's what was restated. It was a very narrow, it was a very narrow issue. So your position, the only real corrective disclosure, if you will, is the April. Correct. That's, that's, we think that's the only arguably corrective disclosure. And what did it correct? Again, it was very narrow in its focus. It talked about this restatement of a certain accounting and the controls related to that accounting issue. And that was all it said, nothing, nothing, nothing more. And as far as the statement in and when they made that statement, there was arguments made about whether the restatement itself was material and under accounting guidance, as we've noted in our brief restatements required for material accounting issues. But materiality for accounting is not the same as materiality for purposes of securities, federal securities laws under BASIC and TSCB Northway and, or in Burlington. And there you go. Thank you very much. Thank you. Thank you very much. Thank you, your honors. Just to address a few more points that were raised in your my friend, you know, as far as the attempt to cabin the departure of the CFO to the ultimate restatement, I think that that's a very strained reading of the record. The record is CFO won't sign financials. Actually, he won't sign financials four months after the prior CFO Crespo resigned from the company. That's A. B, he doesn't sign the financials. They try to get at least two other employees to sign those financials. They won't sign the financials. The company can't ultimately file its 10Q. And he and the CFO, the former CFO goes to the board and launches investigation. Several months later, you have a restatement to say that that A is not related, is not the proximate cause of B, we think is really is a strained reading the record. And that's what you need incentive, you need a proximate cause. A few other points, as far as the efficient market hypotheses, which is what, you know, the argument defendants that there's some embrace of efficient market hypotheses here, that's unique as to all other circuits, and apparently the Supreme Court is that the efficient market hypothesis is that stocks don't decline for no reason, particularly by material amounts. So when a stock goes down by 10%, after the April disclosure, or 6% after the August disclosure 2023, it went down for a reason. And the reason is, there's no other reason brought to the record by defendants. The reason was, was because of the announcements of the CFO departure in August, and the restatement in April. And so and for the court itself looks at for the court itself contradicted itself by looking at the ultimate horizon several weeks afterwards, with respect to the first corrective disclosure, but decided not to look at that horizon for the second disclosure. So we're operating an efficient market, we've got to look at all of that, we've got to look at the how the stock reacts the day after, multiple, you know, multiple days after, as well as several weeks after, and was there any intervening good news. And we do have on the record here, Your Honor, good news regarding the positive trial, which occurred just that very day thereafter, which is why the stock had recovered merely a mere two days later, after the April disclosure. So we've got to be consistent with the application of the efficient market hypotheses. I think this case is really much different than Burlington. And we're talking about the way the Burlington create a bright line rule, it may be and we're not arguing the same, it might be if you could establish that there was no negative market reaction. When I say market reaction, we have to also look at not just the stock raw stock data itself, but also how the company compared to its indices and net results generally. If there is also ultimately no reaction whatsoever in the several days after a disclosure, then under Burlington, the efficient market hypothesis, you may now have a corrective disclosure, really a loss causation question. Yes, 100% is a loss causation question. And candidly, and I hate to say it, Burlington got it wrong on that. This is a loss causation inquiry. If you want to look at if you want to look at materiality, look at whether or not a reasonable investor want to know something. If you and Burlington has the error there, because it talks about it conflated loss causation materiality. And unfortunately, the district court just continued that conflation by all of a sudden that only analyzing materiality by looking at two dates and statements as opposed to the entire class period. But absolutely, but at least keeping consistent with efficient market hypotheses, you've got to look at everything. And you've got to look at what's moving the market, why declines a certain date. And Burlington's progeny all are dealing with cases that particularly the circuit court level that had no stock price reaction whatsoever. That's that is completely different than a scenario here where there's a huge there's a significant stock price reaction. And there's an admission by the company, this is material, I think that I think it would really be a game stopper and a changer for all of a sudden, despite a company's admission of materiality, and including a stock price reaction, we've got because there was some recovery some days thereafter, we don't have any finding of materiality, particularly when I think there was a mistake on materiality in the first instance. So that's, I think, and another point, we certainly plead in the amended complaint, there's an efficient market. That's something actually, this court or the district court has to make a determination as to whether or not there's an efficient market, it could very well be that the court would find not, there's not efficient market, which would defeat class certification, but our plaintiff still here would have individual claim. So therefore, you can't, it can't just be married. Once the next has been a finding by the district court of an efficient market, which all goes to say was premature for the district court to dismiss this case. I'm in the first place. I rest on my arguments. Thank you very much. Thank you. Castle would also like the transcript. In this case, I'm going to ask you to split the cost talk to the clerk about how you go about ordering the transcript. Thank you very much. Go right there. Thank you.